UNITED STATES, Appellant and Cross-Appellee

v.

GRADY W. PHILLIPS, Major, U. S. Army,
Appellee and Cross-Appellant

3 USCMA 137, 11 CMR 137

No. 1244

Decided July 31, 1953

LT COL Thayer Chapman, U. S. Army, CAPT Irvin M. Kent, U. S. Army, 1ST LT Bernard A. Feuerstein, U. S. Army, and 1ST LT Martin Blackman, U. S. Army, for Appellant and Cross-Appellee.

Frederick Bernays Wiener, Esq., LT COL George E. Mickel, U. S. Army, and LT COL George M. Thorpe, U. S. Army, for Appellee and Cross-Appellant.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

A statement of facts is necessary to a proper understanding of the issues, so we deal with them before relating the contentions which divide the parties. First, we relate the testimony which is undisputed but which the court might have disregarded because it was furnished by the principal actors.

At the time of his conviction, the accused was a doctor at the Fort Belvoir, Virginia, hospital. On the night of February 25, 1952, he was working late at the hospital. Shortly after midnight he left the hospital and decided to try out his automobile, as it had just been repaired. After driving a short time, he became hungry and sought out a place to eat. Finding no place in the vicinity open at that time, which was about 2:00 a.m., he drove into Washington, D.C. On the way home, as he approached the Washington end of the 14th Street bridge, he noticed someone thumbing a ride. He stopped and picked up the pedestrian who turned out to be Corporal William Elliott, a member of the Marine Corps from Quantico, Virginia. Elliott was to be discharged from the Marine Corps the next day, and he, along with three friends, had spent the night in Washington celebrating the occasion, during which time he had consumed a substantial amount of whiskey. From this point on, two conflicting stories were presented to the court by the accused and the corporal.

The latter testified that shortly after getting in the car of the accused, the topic of conversation turned to a discussion of "queers." After driving for a short period of time and while they were traveling on Shirley Highway in Virginia, the accused started to fondle

the corporal's leg, and then while the car was still slowly moving, he unzipped the corporal's trousers, and committed an act of sodomy per os upon him. To keep from going off the road, the corporal held the wheel and steered the car. The vehicle was driven to a stop on a side road and at that time, the accused committed another similar act of sodomy upon Elliott.

The testimony of non-participating witnesses established that Mr. Murphy and Mr. Eike, two police officers cruising in the vicinity, noticed the brake lights of a car flashing off and on. As they approached it from the rear, they saw a head rise up from the direction of the passenger's lap. Officer Eike opened the the door on the passenger's side and noticed he had his trousers and shorts down. Officer Murphy opened the door on the driver's side and told him he was under arrest, to which the driver replied, "I don't know what you are arresting us for, I was just taking this boy back to his camp." The driver was the accused and the passenger was Elliott.

Officer Eike then took the two participants to the police station in the police car while Murphy drove the other car back. At the station the accused identified himself as Major Grady W. Phillips, but he had to open the trunk of his car to procure positive identification, for his wallet which contained his identification papers was locked in his brief case and it was locked in the trunk. During the ride to the station, the corporal raved at the accused, stating that it was all his (accused's) fault that he got mixed up with a "queer," and that if he did not receive his discharge from the Marine Corps and his girl would not marry him, it was because of the accused's conduct. The accused made no attempt to deny these accusations at the time they were made.

The story related by the accused consisted of a denial of any acts of sodomy and an assertion that Elliott assaulted him in an attempt to require the accused to drive to Quantico. The accused testified Elliott told him of the party his friends had that evening, and of his life in the Marines. The accused informed Elliott that he was driving only as far as the Belvoir cutoff, and that he was not going all the way to Quantico. Some distance out of Washington Elliott said, "I think you'd better take me to Quantico." An argument followed and Elliott pulled a knife, or what appeared to the accused as a knife, and he directed the accused to take him all the way to his station. Elliott held the knife against accused's neck. In an attempt to catch the corporal off guard, the accused swerved off the road at one of the cutoffs. The car was stopped, and a fight ensued. During the course of the fight Elliott knocked his glasses to the floor of the car and because he was very nearsighted (vision 20/400), he immediately began looking for them. Just as he was raising his head from the floorboard of the car, the officers drove up. He claimed he did not know how the corporal's trousers became unfastened and pulled down. He said "good" to the officers when he was informed he was under arrest, although neither of them remember such a statement. He tried to tell them his story at the time of the arrest, but they told him to shut up and that he would get plenty of chance to tell it to the judge. At the station he refused to tell his part in the sordid drama, because he realized he could not get justice in such a situation and he would wait and tell it to the military authorities. He gave a full statement the following day to the CID agent at Fort Belvoir. It was substantially the same story he related while on the witness stand.

The accused presented five character witnesses, some of whom were eminent physicians, who testified they knew the accused well; that his reputation for truth and veracity was excellent; that they would believe him under oath; and, that he had never exhibited any signs of homosexuality in the past.

The court-martial found the accused guilty of one specification of sodomy, and sentenced him to be dismissed from the service, total forfeitures, and confinement for one year. The convening authority approved the findings and sentence, but the board of review reversed on the failure of the law officer

to define certain words in the instruction.

The case is before us upon both a certificate by The Judge Advocate General of the Army and a petition filed by the accused and granted by us. The certified question challenges the correctness of the decision of the board of review and the petition sets forth eleven assignments of error. Disposition of the case does not require consideration of all contentions advanced by the accused and we shall, therefore, limit this opinion to those hereinafter discussed.

## I

Several of the assignments of error advanced by the accused are based upon a contention that the evidence is insufficient to support a finding of guilty. We believe these contentions must be overruled. However, to show clearly why we grant a rehearing and not a dismissal, we state generally why the facts were sufficient.

The principal evidence against the accused was the testimony given by the ▪ participant in the alleged sodomy. This evidence is contradicted only by the accused's testimony, and, if the corporal's testimony was believed by the court-martial members, it is sufficient to support the finding. Defense counsel contend, however, that the testimony of a pathic in a sexual offense such as this must be corroborated by other evidence in order to sustain a verdict of guilty. Several Federal cases are cited and we are not in disagreement with the rule announced therein to the effect that an offense such as that charged herein must be clearly and impartially proven. We find no basis in that rationale to depart from the rule adopted by the military and announced in paragraph 153(a), Manual for Courts-Martial, United States, 1951. We quote:

". . . a conviction cannot be based upon the uncorroborated testimony of an alleged victim in a trial for a sexual offense, or upon the uncorroborated testimony of a purported accomplice in any case, if such testimony is self-contradictory, uncertain, or improbable. . . ."

Assuming, without deciding, that the corporal's testimony was such that we are required to invoke the Manual rule, we, nevertheless, believe the record contains sufficient corroboration of his evidence to sustain the conviction under that rule. There are many facts and circumstances in the record to reinforce the testimony of the pathic but because of the degrading nature of the offense we mention but a few: (1) the accused's testimony presents an incredible story which is weakened by his statement to the officers that he did not know why he was being arrested since he was just taking Elliott back to his camp. This is a strange statement when made by one who claims he has just been subjected to a violent attack. (2) The car was stopped off the main highway at about 3:30 a.m. under suspicious circumstances. (3) The trousers of Elliott were off, tending to show that an act of the nature charged may have been committed, and tending to negate accused's story of a fight. (4) The accused failed to deny the statements made by Elliott while they were en route to the police station, to the effect that he, Elliott, had become mixed up with a "queer." (5) The accused was not carrying any positive identification at the time of the offense, but had his identification in his brief case which was in the trunk of his car. (6) The arresting officers saw accused's head rise from the direction of Elliott's lap. (7) Accused's physical condition suggested some sex activity by him.

We believe that any reasonable person presented with that array of facts would conclude there was ample evidence to fortify the testimony of the corporal. Accordingly, we hold that the evidence was sufficient to sustain the finding of guilty.

## II

The board of review, in passing upon the adequacy of the instructions given ▪ by the law officer on the elements of the offense, held that his failure to define "unnatural carnal copulation" was prejudicial error. The certified question seeks our determination of wheth-

140

er such an instructional failure constitutes reversible error.

In instructing the court-martial, the law officer stated:

"The court is advised that the elements of the offense are as follows: Sodomy is charged, and the elements of the offense are as follows: That at the time and place alleged, the accused engaged in unnatural carnal copulation with a certain other person, as alleged."

The law officer also referred the members of the court-martial to the discussion on sodomy set forth in paragraph 204.

The board of review relied largely upon our decision in United States v. Gilbertson (No. 318), 1 USCMA 465, 4 CMR 57, decided July 22, 1952. In that case we reversed a finding of guilty of misbehavior before the enemy on the grounds that the term "misbehavior" as used in the instruction contained no legal standard by which the actions of the accused could be measured. We need not decide whether the principle announced in that case should be here applied for the reason that since the board of review handed down its decision, this Court, all Judges concurring, has announced a rule that, without a request being made therefor, failure on the part of the law officer to clarify or elaborate upon the meaning of words used in an instruction is not reversible error. See United States v. Day (No. 4703) 2 USCMA 416, 9 CMR 46, decided April 30, 1953, and United States v. Felton (No. 1639), 2 USCMA 630, 10 CMR 128, decided June 12, 1953. That rule is controlling in this instance and answers the certified question.

Because we are interested in having law officers give instructions which are complete in all respects, we mention the pronouncement by the Secretary of the Army referred to by appellate defense counsel. In a recently published pamphlet "The Law Officer" he stated that the instructions to be given on sodomy should contain a definition of the phrase "unnatural carnal copulation." The pamphlet goes on and sets forth such a definition. We say unhesitatingly that a definition is desirable. However, we repeat that in the absence of a request by defense counsel, words of common usage used in instructions need not be defined. If further clarification of instructions is desired, the burden is upon the defense to bring it to the attention of the law officer. It is only when the court-martial would not be adequately and properly informed on the elements of an offense that a duty falls upon the law officer to define words and phrases and here such was not the case.

### III

At the conclusion of the evidence for both sides, defense counsel submitted five written instructions to the law officer with the request that they be submitted to the court-martial. Because reversible error was committed by failure to give the following requested instruction, we shall be concerned only with it.

"The Court is instructed that evidence of good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt; and the circumstances may be such that an established reputation of good character would alone create a reasonable doubt, although without it the other evidence would be convincing."

The law officer rejected this instruction. He was content to direct the court's attention to the Manual for a discussion of the credibility of witnesses and to give the Manual instruction on reasonable doubt and the weighing of evidence. We know not the particular reason the law officer had for rejecting the request but we have noted great reluctance on the part of those officers to give clarifying and amplifying instructions. We cannot stress too strongly the necessity of giving relevant instructions if they are the subject of a request.

The instruction in question has been the subject of considerable controversy. The language is taken from the Supreme Court decision of Edgington v. United States, 164 US 361, 366, 41 L ed 467, 17 S Ct 72, where it is stated:

**141**

"... good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

In spite of the language used in that decision, many Federal appellate courts have not required that an instruction embodying that concept be given by a trial judge. Le More v. United States, 253 F 887 (CA5th Cir); Grace v. United States, 4 F2d 658 (CA5th Cir); United States v. Kelly, 105 F2d 912 (CA2d Cir). On the other hand, other Federal appellate courts have ruled that such language incorporated in an instruction should be given upon request. United States v. Klass, 166 F2d 373 (CA3d Cir); United States v. Donnelly, 179 F2d 227 (CA7th Cir); Villaroman v. United States, 184 F2d 261 (CA DC Cir). It is worthy of note, however, that in virtually all of the cases which did not require an instruction in the particular language, there were instructions given to the jury to guide the members on the effect of character evidence. In the instant case, not only was the requested instruction not given, but the law officer failed to give any instruction touching on the subject. One of the most recent pronouncements which casts light on this principle may be found in Michelson v. United States, 335 US 469, 476, 93 L ed 168, 69 S Ct 213. There the United States Supreme Court stated:

"... this Court has held that such testimony [evidence of good character] alone, in some circumstances, may be enough to raise a reasonable doubt of guilt and that in the federal courts *a jury in a proper case should be so instructed.*" [Emphasis supplied].

Is this a proper case? We believe it is for the following reasons: Character evidence is of greater value to an accused in one type of case than in another, depending on the nature of the charge, and the defense. The primary

function of character evidence is an attempt to show that accused, being of good character, would not commit the particular crime, because of the great amount of moral degradation which is involved, and also to show that his story of the events should be believed, because of his good reputation for truth and veracity. Of course, the greater the moral turpitude involved in the crime, the more unlikely one of good character would so offend against society. Certainly the crime of sodomy is one of the more heinous offenses for few crimes are more revolting. Furthermore, character evidence has an added relevance in this type of case, for a charge of sodomy is one of the most difficult to meet. There are usually only two people who know the details of the crime—the accused, and the victim. It is often a case of the victim's story with varying amounts of corroboration, versus the accused's story without corroborative facts and circumstances. Because of this, evidence of good character is often the best, if not the only, defense which the accused can produce. Accordingly, this is a proper case for the use and consideration of such evidence.

Because there was no instruction on character evidence given in this case, we need not indulge in an extended discussion as to whether the instruction in question was a proper one. There should have been some instruction given, and even were we to conclude the requested instruction was not correct in all details, that would not relieve the law officer of his duty to give the court-martial some guidance on the subject. We recently stated in United States v. Burden (No. 1038), 2 USCMA 547, 10 CMR 45, decided May 25, 1953:

"... The argument continues that the proposed instructions did not state the law correctly and this relieved the law officer of the duty of giving any instructions on the subject. The argument is not persuasive. *It is certain the proposed instruction was sufficient to put the law officer on notice that an instruction on voluntary intoxication was essential to a proper disposition of the*

*case.* We have shown that a request was reasonable in the light of the evidence presented and we can find no good reason why the law officer did not give the proposed instruction or one modified to fit the occasion. . . ." [Emphasis supplied].

In the instant case the requested instruction put the law officer on notice that this issue was essential to a proper finding. Therefore, he erred in not submitting the request or a satisfactory substitute to the court.

Before we will reverse a finding and sentence because of a failure to instruct on the effect of good character evidence, we must determine whether the error was prejudicial to the accused. We have stated earlier that in a charge of sodomy, evidence of good character is often the only defense. In any case the accused is an interested witness, and consequently his story of the events is considerably weakened by that fact. Given the slightest doubt about his credibility, the court-martial is apt to convict. It may often take corroboration—or strong evidence of good character—to overcome the repelling nature of the testimony. As a result the accused needs the benefit of any evidence and any instruction on its proper usage that may have a tendency to render his story plausible and convincing. The factual setting in this case pitted the accused against a pathic and his only escape was to satisfy the members of the court-martial that his character was such that he would not stoop to the level of committing the alleged offense. The law officer failed to accord the accused the minimal benefit flowing from his good character. Prejudice is apparent and the conviction must be reversed for that reason.

The question certified by The Judge Advocate General must be answered contrary to the holding of the board of review, but the decision is affirmed because of the failure of the law officer to give the requested instruction on character evidence. A rehearing is ordered.

Chief Judge QUINN and Judge BROSMAN concur.